# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 14-cv-22072-KING

FF COSMETICS FL INC.,
a Florida corporation doing business
as Forever Flawless Cosmetics 1;
TIMELESS COSMETICS FL INC.,
a Florida corporation;
BRILLIANCE NEW YORK, LLC,
a New York limited liability company,
f/k/a/ Brilliance New York, Inc.; and
OCEANE FL COSMETICS INC.,
a Florida corporation doing business as
Tresor Rare,

       Plaintiffs,

vs.

CITY OF MIAMI BEACH, FLORIDA,
a Florida municipal corporation,

       Defendant.
_____/

## PRELIMINARY INJUNCTION

THIS CAUSE comes before the Court upon Plaintiffs' Renewed Motion for Preliminary Injunction (DE 27). The Court held a preliminary injunction hearing, which lasted five days and was spread out over three months. The Court renders this opinion with the benefit of having heard live testimony, documentary evidence, and oral arguments. For the reasons that follow, Plaintiffs' motion is granted and a preliminary injunction is entered.

### I.   Background

Each Plaintiff operates a store in Miami Beach, Florida, as an authorized retailer for specialty cosmetics, skin care, and beauty products. Their storefronts are on Lincoln Road, in the City's historic district. Lincoln Road runs several blocks, lined on either side with shops and restaurants. The road is closed to cars and other motorized vehicles such as Segways. Bicycling and skateboarding are prohibited during certain hours. Pedestrians roam freely.

Chairs and tables belonging to sidewalk cafes and restaurants sprawl out from the buildings' facades or take up space in the middle of the road. *See* TR 04/29, at 94:12–14.[1] It is a popular tourist destination, teeming with visitors daily.

Plaintiffs have a common business model that depends on soliciting these visitors, particularly the tourists, who stroll past their stores. To attract their attention, Plaintiffs employ one, two, or three "greeters" who stand in front of their stores, calling out to passers-by with salutations, such as "Hi, how are you?" and "Where are you from?" They express compliments or ask questions such as "What do you use for your eyes?" They make entreaties, such as "I will give you a free sample" or "would you like to have a free demonstration?" They distribute handbills. This behavior has been variously referred to as greeting, hawking, barking, or soliciting. Whatever its proper label, the purpose of this behavior is clear: to get passers-by to bend their steps into Plaintiffs' stores to buy their products.

The City wants all of this to stop. Because it's not just the Plaintiffs. It seems many businesses on Lincoln Road, Ocean Drive, and elsewhere in the City's historic district, particularly the restaurants and cosmetics stores, employ people to stand outside and cat-call the walking public, who in turn complain to the City. The phenomenon of all these greeters is annoying to some—annoying to have their day of strolling, shopping, and leisure interrupted every twenty paces by another greeter handing them something, enticing them with fifty-percent-off meals, or commenting on their looks. Some people feel harassed or embarrassed. Their annoyance is compounded by the ubiquity of these greeters. One witness described walking down Lincoln Road as having "to come through a gauntlet."[2] TR 07/28, at 79:17–20. Another described the constant barrage of handbills as "death by paper cut." TR 07/27, at 80:10–11. The City, protective of its aesthetics and of its attractiveness as a tourist destination, fears annoyed pedestrians.

---

[1] The Court will cite to the transcripts as follows: "TR" followed by the date of the transcript, followed by page and line number. For example, text appearing on the third line of the third page of the transcript of April 29, 2015, would be cited as "TR 04/29, at 3:3."

[2] He meant "gantlet." *See* PATRICIA T. O'CONNER, WOE IS I 101 (2004) ("You run the *gantlet*, but you throw down the *gauntlet*.").

So the City started enforcing two sections of its Code of Ordinances: Section 74-1, an anti-soliciting ordinance, and Section 46-92, an anti-handbilling ordinance. Broadly speaking, the ordinances prohibit soliciting and handbilling in the public right-of-way within certain streets and other areas of the City's historic district—what one witness called "the entertainment district"—which includes Lincoln Road, where Plaintiffs operate. TR 07/27, at 69:20–21.[3] Plaintiffs received several citations for violating the ordinances, incurring fines ranging from $50 to $250. Yet their employees kept greeting, and the citations kept coming. TR 04/29, at 117:21–118:5. The City threatened at least three of the plaintiffs that they risked their occupational licenses if their employees did not stop. TR 04/29, at 42:25–43:5; TR 07/27, at 163:4–11.

Aggrieved at being fined for speaking in public, the plaintiffs sued on June 5, 2014, to enjoin the City from enforcing the two ordinances, claiming injury to their First Amendment rights. A little less than six months into the litigation, the City amended the ordinances. The amendments, which became effective on November 29, 2014 (DE 24 ¶ 3), prompted Plaintiffs to file an Amended Complaint (DE 26).

Plaintiffs also filed a Renewed Motion for Preliminary Injunction, which targets only the amended versions of the ordinances. *See* DE 27, at 6 ("this Motion will concentrate on the current, amended version[s] of both Ordinances"). Whether Plaintiffs succeed in pursuing their injunction or not, they may still have viable claims for monetary damages suffered under the prior versions of the ordinances. Unless otherwise noted, all discussion of the ordinances in this opinion concerns the amended versions.

## II.   Standard for Preliminary Injunction

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the

---

[3] A map detailing the area covered by the ordinances was introduced as part of Defendant's Exhibit 3, and is also found at DE 35-42. It is attached to this opinion as Appendix 1.

injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The Court turns first to the merits question.

**III.    The Anti-Solicitation Ordinance Regulates Plaintiffs' Commercial Speech**

The anti-solicitation ordinance (Section 74-1) reads, in pertinent part, as follows:

(a)      *Prohibitions.* It shall be unlawful to solicit any person for the purpose of inducing such person to purchase any property, real or personal, or any food, beverage or service, or to solicit such person to enter any place of business for the purpose of inducing or attempting to induce such person to purchase any property, real or personal, or any food, beverage or service.

        This Section shall apply when the solicitor or the person being solicited is located on any public right-of-way, which means and includes, but is not limited to, any street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway, in any of the following areas in the City of Miami Beach. This Section shall also apply to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way, in [certain streets and other areas of the City's entertainment district. *See* Appendix 1. The full text of this ordinance and its amendments are attached to this opinion as Appendix 2.]

The parties present an initial question of what framework to use in analyzing this ordinance. Plaintiffs argue that it proscribes more than commercial speech, and is therefore subject to an overbreadth attack. *See Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989). It cannot be disputed, however, that the ordinance significantly proscribes commercial speech, which includes Plaintiffs' speech on the public right-of-way.

Commercial speech has been variously described as speech which does "no more than propose a commercial transaction,'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385 (1973)), or as "expression related solely to the economic interests of the speaker." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Such speech is "the offspring of economic self-interest," *id.* at 564 n.6, analytically separated from other varieties of speech by a "commonsense distinction." *Id.* at 562 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–456 (1978) (internal quotation marks omitted)). In this way, commercial speech is not a "rigid

4

classification[],"dependent on any definite set of characteristics. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 81 (1983) (Stevens, J., concurring in the judgment).

Whatever form the greeters' speech takes, their engagements with the walking public have one underlying message and one object, albeit often indirectly stated: to have prospects enter their stores and purchase Plaintiffs' products. The Court here makes a commonsense distinction: Plaintiffs' speech is commercial speech.

The Court is mindful that "the lawfulness of the particular application of the law should ordinarily be decided first." *Fox*, 492 U.S. at 485. Because Plaintiffs' speech is commercial speech, and because of the limitations found in the ordinance's plain language, (described in Part III.D.1., below), the Court finds it proper to take the ordinary route; that is, the Court will analyze this ordinance as applied to Plaintiffs' commercial speech, under the Supreme Court's four-part framework for commercial speech articulated in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). The Court will take a different route with the anti-handbilling ordinance. *See* Part IV, below.

### A. Plaintiffs' Commercial Speech is Neither False nor Misleading

"At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." *Cent. Hudson*, 447 U.S. at 566.

The City leans heavily on this initial question. It claims that Plaintiffs' "sales pitch" is false and misleading, i.e., that Plaintiffs' salespersons tell misrepresentations and outright lies about Plaintiffs' products to prospective customers. Particularly, among the products that Plaintiffs sell are those that boast of containing diamond dust, which ostensibly provides various health or beauty benefits to those who use them.[4] For example, employees of some of the Plaintiffs tell customers that certain products help to produce collagen, and that diamonds in the products allow ingredients to be delivered through the pores of the skin. TR 04/29, at 124:6–17. The City's expert, Dr. Bryan Fuller, a skin biochemist, explained in a manner that

---

[4] The Court notes, without accepting as true (no evidence was offered on this point at the preliminary injunction hearing), Plaintiffs' representation that "Timeless Cosmetics no longer markets any line of cosmetics with diamond powder. Tresor Rare continues to market diamond-based cosmetics but it represents only a small portion of their product line." DE 75, at 12 n.11.

was scientific, sober, and most of all credible, that these propositions, among other claims to the salutary effects of some of Plaintiffs' products, and diamond dust in particular, are preposterous.

The parties filed several pretrial motions related to this issue and the City explored it at length during the preliminary injunction hearing. The information on what Plaintiffs' employees said, so that the Court might evaluate whether such statements were false and misleading so as to lose First Amendment protection, came from three sources: (1) Plaintiffs' testimony; (2) testimony from those who observed Plaintiffs' employees; and (3) transcripts of secretly recorded conversations with Plaintiffs' employees.[5]

At the end of the preliminary injunction hearing, one conclusion is inescapable: The most that anyone ever heard Plaintiffs' greeters say outside their stores, on the public right-of-way, were the various salutations, entreaties, and comments described earlier, such as "Hi, how are you?" and "Where are you from?" Their remarks notably lacked of anything false or misleading. None of the witnesses, including those called by the City, testified to any false statements on the public right-of-way.

These facts, in light of the plain language of the ordinance, resolves the first prong of the *Central Hudson* inquiry in Plaintiffs' favor. The ordinance draws a distinction between solicitations on the public right-of-way[6] (which are proscribed) and solicitations anywhere else (which are not). As this Court observed previously, "[s]peech on or directed to those on the public right-of-way is what the ordinances proscribe. That is the speech for which the Plaintiffs face government citations, fines, and threats. That is the speech for which Plaintiffs seek protection. It is the character of that speech that is central to Plaintiffs' as-applied claim and to this Court's inquiry." DE 95, at 3 (footnote omitted). What false or misleading statements Plaintiffs' employees may have uttered inside their stores is of no moment as far as the ordinance is concerned. Because Plaintiffs' speech outside their stores was neither

---

[5] The Court admitted some but not all of these transcripts, recorded in Florida with only one-party consent, as a matter of federal evidence, with no comment on their propriety—or lawfulness—in any other regard. *See* Fla. Stat. 934.01 *et seq.*

[6] The ordinance's reach is not really limited to the public right-of-way, as explained in Part III.D.1., below.

false nor misleading, it is entitled to that "qualified but nonetheless substantial protection accorded to commercial speech." *Bolger*, 463 U.S. at 68.

Even assuming the relevancy of Plaintiffs' speech *inside* their stores,[7] and even assuming that employees of some of the Plaintiffs made some false or misleading statements about some of their products inside their stores, the City has not demonstrated that Plaintiffs' speech was mostly, or even often, false or misleading.[8] The ordinance does not distinguish between false or misleading solicitation and other kinds of solicitation; and "where, as with the blanket ban involved here, truthful and nonmisleading expression will be snared along with fraudulent or deceptive commercial speech, the [City] must satisfy the remainder of the *Central Hudson* test by demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Edenfield v. Fane*, 507 U.S. 761, 768–69 (1993).

## B.  The City's Asserted Interests are Substantial

A regulation of commercial speech must serve a legitimate, substantial interest. "To find a 'substantial interest,' a court must conclude both that the interest advanced by the state is legitimate in theory, *and* that that interest is in remedying a problem that exists in fact (or probably would exist, but for the challenged legislation)." *Sciarrino v. City of Key West, Fla.*, 83 F.3d 364, 367 (11th Cir. 1996). Although the City "may not rely on 'mere speculation or conjecture'" to justify the ordinance, neither must it "present 'empirical data . . . accompanied by a surfeit of background information.'" *Falanga v. State Bar of Ga.*, 150 F.3d 1333, 1340–41 (11th Cir. 1998) (quoting *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 628 (1995)).

The City asserts ten interests to support the challenged ordinances:

---

[7] It is not clear that all of the Plaintiffs operate this way, but at least one of the Plaintiffs testified to a division of labor whereby its greeters do not follow the customers inside the store, but rather pass them off to a different employee and resume their greeting duties outside.

[8] This failure results in no small part because transcripts of secretly recorded conversations were admitted only as to Plaintiffs Brilliance New York (Defendant's Exhibit 6) and Forever Flawless (Defendant's Exhibits 7 and 8). The Court admitted no evidence of any statements made inside the stores of Oceane (Tresor Rare) or Timeless Cosmetics.

(1) protecting the historic character of the District, the City's economic engine;
(2) developing the high-end retail and high-end sidewalk café promenades in
the District; (3) promoting luxury tourism; (4) minimizing harassment of
pedestrians along the public right-of-way; (5) minimizing congestion;
(6) reducing litter; (7) improving the aesthetic experience of the District for
residents and visitors; (8) protecting the right of pedestrians to be left alone in
their quiet enjoyment of these districts; (9) maintaining the unique ambiance
the City has created in these sectors; and (10) the expansion of other areas
where commercial solicitation is allowed within the City.

DE 37, at 12–13.

Without parsing each asserted interest (some of which overlap), the Court readily concludes that the City has asserted interests that are "legitimate in theory." *Sciarrino*, 83 F.3d at 367; *see also Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984) ("municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *Edenfield*, 507 U.S. at 769 ("Even solicitation that is neither fraudulent nor deceptive may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient. In *Ohralik,* we made explicit that 'protection of the public from these aspects of solicitation is a legitimate and important state interest.'") (quoting *Ohralik*, 436 U.S. at 462).

The City also presented substantial witness testimony to show that its asserted interests are "in remedying a problem that exists in fact." *See Sciarrino*, 83 F.3d at 367. For example, Jessica Elmaleh, who owns a shoe store next to Brilliance New York, testified that she has seen Brilliance's greeters follow people down the street and touch people's hair. TR 04/29, at 58:7–20. She has also seen them approach people who are standing in front of her shoe store. *Id.* at 60:5–7. She often crosses the street to avoid the greeters, "mak[ing] a detour just not to be bothered." *Id.* at 61:3–4. Jeffrey Weinstein, Director of Development for a Lincoln Road business, has seen Plaintiffs' greeters "stop people in the middle of their stroll" and "chase after them in certain cases." TR 07/28, at 82:18–22. Mark Ehrlich testified that one of Plaintiffs' greeters told him he had a nice face but it was marred by "blackheads." TR 07/28, at 112:17–22. This embarrassed him. *Id.*

Jose Jimenez, the former Assistant City Manager for Miami Beach, testified not only that he received many complaints about soliciting and handbilling, but that he personally

8

experienced excessive soliciting and handbilling. "It was like death by paper cut," he said. TR 07/27, at 80:10–11. Hernan Cardeno, Director of Miami Beach's Code Compliance Department, testified that he had to draw personnel and financial resources away from other City districts to the entertainment district to deal with the solicitation problem. TR 07/28, at 38:20–39:3.

Sasha Perisic, a neighboring restaurateur, testified that greeters from Timeless Cosmetics stand outside every day (although they don't bother him). TR 04/29, at 24:8–9. Pedro Igrejas, the general manager of a neighboring business, testified similarly about Brilliance New York's greeters. *See* TR 04/29, at 100:12–13; *see also* TR 07/27, at 171:3–7.

The Court credits substantial witness testimony adduced at the preliminary injunction hearing to the effect that solicitations and handbilling in Miami Beach's historic district is a problem that exists in fact, and that it causes annoyance and aesthetic harm.

## C.  The Anti-Solicitation Ordinance Directly Advances the City's Interests

The City must "'demonstrate that the challenged regulation advances [its asserted] interest[s] in a direct and material way.'" *Harrell v. Fla. Bar*, 608 F.3d 1241, 1270 (11th Cir. 2010) (quoting *Went For It, Inc.*, 515 U.S. at 625–26) (alterations in original). "Both the Supreme Court and [the Eleventh Circuit] have noted that anecdotal evidence may support a conclusion that the challenged regulation directly and materially serves the State's substantial interest." *Wollschlaeger v. Governor of Florida*, ---F.3d----, No. 12-10049, 2015 WL 4530452, at *26 (11th Cir. July 28, 2015). Furthermore, "a partial solution to a city's aesthetic problems may still directly advance the city's goals. The Constitution does not require the City to choose between curing all of its aesthetic problems or curing none at all." *Don's Porta Signs, Inc. v. City of Clearwater*, 829 F.2d 1051, 1053 (11th Cir. 1987).

Much for the same reasons that the Court finds the problem of soliciting to exist in fact, the Court finds that the ordinance directly advances the City's interest in remedying the problem. The City adduced sufficient evidence, albeit some in the form of anecdotes or loose observations, that the anti-solicitation ordinance has helped to reduce solicitations in the City's historic district. *See* TR 07/27, at 76:12–13, 110:8–111:2; TR 07/28, at 41:11–18. The Court may also comfortably rely on the facial plausibility that an ordinance prohibiting

solicitation tends to chill solicitations.[9] That it does so is the very basis of Plaintiffs'
Amended Complaint.

### D. The Ordinance Reaches Further Than Necessary

"The last element of the *Central Hudson* analysis inquires whether the statute reaches
farther than is necessary." *Sciarrino*, 83 F.3d at 370. This is "the critical inquiry." *Central
Hudson*, 447 U.S. at 569. The First Amendment requires

> a "'fit' between the legislature's ends and the means chosen to accomplish
> those ends," . . . a fit that is not necessarily perfect, but reasonable; that
> represents not necessarily the single best disposition but one whose scope is
> "in proportion to the interest served," . . . that employs not necessarily the
> least restrictive means but . . . a means narrowly tailored to achieve the
> desired objective.

*Fox*, 492 U.S. at 480 (internal citations omitted).[10] The cost to Plaintiffs' First Amendment
interests of advancing the City's legitimate goals must be "carefully calculated." *Id.* at 481.
The City bears the burden of justifying its restrictions; it must "affirmatively establish the
reasonable fit."[11] *Id.*

The Court concludes that the anti-solicitation ordinance reaches further than
necessary—a conclusion compelled by a plain reading of the ordinance, evidence adduced at
the preliminary injunction hearing, and Eleventh Circuit and Supreme Court precedent. The
ordinance is a blanket ban, disfavored in the law; and the City has failed to meet its burden of
demonstrating the inadequacy of less-intrusive alternatives. The cost of the ordinance to
Plaintiffs' First Amendment interests is too high. Plaintiffs have shown a substantial

---

[9] *Cf. Wollschlaeger*, 2015 WL 4530452, at *27 (accepting Florida's direct-advancement
argument "given the facial plausibility of the legislature's conclusion" "that proscribing highly
intrusive speech that physicians themselves do not believe to be relevant or necessary directly
advances the State's interest in protecting its citizens from harmful or ineffective professional
practices and safeguarding their privacy.").

[10] This inquiry dovetails with the otherwise-employed "time, place, and manner" analysis; for
"[w]here a restriction on speech lacks this close and substantial relation to the governmental
interests asserted, it cannot be, by definition, a reasonable time, place, or manner restriction."
*Edenfield*, 507 U.S. at 773.

[11] The City bears this burden even at the preliminary injunction stage. *See Chase v. Town of
Ocean City*, 825 F. Supp. 2d 599, 617 (D. Md. 2011).

likelihood of success on the merits of their claim that, as applied to their speech, Miami Beach's anti-solicitation ordinance violates the First Amendment.

### 1.  The Ordinance is a Disfavored "Blanket Ban"

In *Fane v. Edenfield*, the Eleventh Circuit was confronted with a Florida statute that banned in-person solicitations by certified public accountants. 945 F.2d 1514, 1517 (11th Cir. 1991) *aff'd*, 507 U.S. 761 (1993). A certified public accountant ("CPA") challenged the statute as "an unconstitutional restriction of commercial speech." *Id.* at 1516. The district court, at the summary judgment stage, enjoined the State from enforcing the ban. The Eleventh Circuit affirmed, explaining that "[b]lanket prohibitions on commercial speech are disfavored. . . . The mere possibility that isolated abuses or mistakes may occur does not justify a total ban on a certain mode of protected commercial speech." *Id.* at 1517 (citing *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 476 (1988)); *see also Cent. Hudson*, 447 U.S. at 566 n.9 ("in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity."); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) ("blanket bans on price advertising by attorneys and rules preventing attorneys from using nondeceptive terminology to describe their fields of practice are impermissible.").

This principle holds when applied to the facts of this case, albeit the State in *Fane* was concerned with a different quality of abuses by CPAs than the City is here by solicitors and handbillers. The anti-solicitation ordinance at issue here must be considered a blanket ban. True, the ordinance's reach is limited in certain respects. It is limited geographically— namely, to the public right-of-way (and certain places adjacent to the public right-of-way) within certain areas of the City's historic district. *See* Appendices 1 and 2. Also, the ordinance prohibits only a certain kind of solicitation—"to solicit any person for the purpose of inducing such person to purchase any property, real or personal, or any food, beverage or service, or to solicit such person to enter any place of business for the purpose of inducing or attempting to induce such person to purchase any property, real or personal, or any food, beverage or service."

However, a plain reading of the ordinance also reveals that it is not limited in critical respects. By the phrase "it shall be unlawful to solicit any person," the ordinance's prohibition on solicitation is, within its geographical limits, absolute—all persons are prohibited from soliciting all persons. The ordinance does not distinguish between solicitations that are invited and those that are uninvited. Nor does it distinguish between solicitors who are businesses (or their employees, agents, etc.) and those who are not. The ordinance does not distinguish between oral solicitations and non-oral solicitations. Neither does the ordinance distinguish between solicitors who know the person whom they solicit and solicitors who are strangers to the person whom they solicit. The ordinance does not distinguish between false and misleading solicitations and truthful, non-misleading solicitations. Importantly, the ordinance does not limit its prohibition to solicitations that impede pedestrian traffic, are too loud, or are otherwise harassing or vexatious. The ordinance is also not limited to the public right-of-way; for the ordinance, by its plain terms, applies "to any doorway, stairway, window, or other opening of a building abutting on or adjacent to such right-of-way." Thus the ordinance reaches into private interests in real property.

For all of these reasons, and although the ordinance bans only a type of solicitation, it is still properly construed as a disfavored "blanket ban"—that is, "a total ban on a certain mode of protected commercial speech." *Fane*, 945 F.2d at 1517 (citing *Shapero*, 486 U.S. at 476). The fact that its reach is geographically limited does not gain it favor, for reasons more fully developed in Part III.D.3., below.

## 2. The City has Failed to Carry its Burden on Less-Intrusive Alternatives

"The burden to justify the extent of the restrictions . . . remains with the would-be regulator." *Sciarrino*, 83 F.3d at 370. The City may carry its burden "[i]f the means reasonably advance the goal and there is no evidence in support of a finding that less restrictive means are available." *Harnish v. Manatee Cnty., Fla.*, 783 F.2d 1535, 1540 (11th Cir. 1986). "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable," *City of Cincinnati v. Discovery*

*Network, Inc.*, 507 U.S. 410, 417 n.13 (1993), but "the court should not attempt to speculate as to whether less restrictive means exist." *Harnish*, 783 F.2d at 1540. "The issue is whether the City has successfully 'demonstrated that its interest . . . cannot be protected adequately by more limited regulation of [Plaintiffs'] commercial expression.'" *Sciarrino*, 83 F.3d at 370 (quoting *Central Hudson*, 447 U.S. at 570). Whether the City can so demonstrate is at the heart of whether it can show, as it must, "a careful effort . . . to draw a balance between the commercial speech rights of the proprietors and the problems the Ordinance addresses." *Id.*

In *Fane v. Edenfield*, for example, the Eleventh Circuit noted that "[r]egulatory requirements exist in Florida that can be utilized to preserve the independence of CPAs who perform the attest function." 945 F.2d at 1518–19. The Court faulted the Board of Accountancy for failing to "offer any explanation as to why those requirements do not adequately afford the protection which it seeks." *Id.* at 1519. The Court concluded that "[t]he Board has the duty to at least explore less intrusive alternatives than a blanket ban on in-person solicitation imposed on all CPAs." *Id.* (citing *Shapero,* 486 U.S. at 477–78).

The City has failed to meet its burden. Substantial testimony revealed that there are "numerous and obvious less-burdensome alternatives" to the City's blanket ban. In the face of such testimony, and in the light of the Eleventh Circuit's *Sciarrino* decision, the City has not "'demonstrated that its interest . . . cannot be protected adequately by more limited regulation of [Plaintiffs'] commercial expression.'" *Sciarrino*, 83 F.3d at 370 (quoting *Central Hudson,* 447 U.S. at 570).

The parties both rely on *Sciarrino* to argue whether less-restrictive alternatives are available to the City. In that case, this Division of Court, and the Eleventh Circuit on appeal, upheld a Key West anti-soliciting and anti-handbilling ordinance as a valid regulation of commercial speech.

The Court has reviewed the full text of Key West's ordinance, with its amendments. However, as a matter of following precedent, the Court perceives an error in consigning the analysis of this prong of the *Central Hudson* inquiry to a comparison of Key West's then-ordinance and Miami Beach's ordinance. The *Sciarrino* opinions (district and circuit) do not

13

reproduce the ordinance's provisions in detail.[12] This Court must look to what the Eleventh
Circuit did write in order to follow the *ratio decidendi* of its decision, and to apply it.

The Court of Appeals in *Sciarrino* described the Key West ordinance as prohibiting
"off-premises canvassing," or "OPC," which refers to the practice of "employing 'barkers' to
distribute handbills to pedestrians and to engage in face-to-face advertising." *Sciarrino*, 83
F.3d at 366.

> The city . . . banned such conduct in specific areas: on public beaches, on
> Mallory Dock, and in public parking lots. . . . Also, OPC activity was
> significantly restricted, but not banned, on five historic streets heavily
> trafficked by pedestrians. . . . In addition, the city established a permitting
> system for OPC barkers who sought to work on public lands.

*Id.*[13] Furthermore, the Plaintiff in *Sciarrino* owned a pizza restaurant "which is just off one of
the busy streets on which OPC activity is now restricted." *Id.*

The *Sciarrino* opinion reveals marked differences between how the Eleventh Circuit
read Key West's ordinance and how this Court reads Miami Beach's ordinance. The
Eleventh Circuit in *Sciarrino* upheld an ordinance that it viewed as significantly restricting,
but not banning, soliciting and handbilling on five historic streets. Miami Beach's ordinance
is a total ban on its selected historic streets. Although the plaintiff in *Sciarrino* relied on
solicitation activities on Key West's historic streets, his storefront was "just off" one of those
streets (where OPC activity was "restricted"). Here, Plaintiffs rely on soliciting on Lincoln
Road, and that is also where their storefronts are. Under Miami Beach's ordinance, they
cannot stand two feet in front of their businesses to wave someone inside—not even if they
do it silently. *See* TR 07/28, at 16:11–17:19 (Melissa Rosa, code compliance officer,

---

[12] For this reason the City has submitted to this Court a copy of the Key West ordinance and an
amendment to it, which the City represents were both in effect at the time *Sciarrino* was decided.
The Court relies on the City's representations that the ordinances it provided are the very same
ones upheld by the *Sciarrino* courts. *See* Fed. R. Civ. P. 11. To this Court, it is not clear that they
are, for the *Sciarrino* courts' descriptions make much more sense as readings of the Key West
ordinance without its amendment than with. The Key West ordinance together with its
amendment (just as the City submitted them) is attached to this opinion as Appendix 4.

[13] This Division of Court in *Sciarrino* described the ordinance similarly. *Sciarrino v. City of Key
West*, 867 F. Supp. 1017, 1019 (S.D. Fla. 1994) ("The Ordinance does not completely ban OPC
activity, but rather limits the location of OPC activity and the number of off-premises canvassers
per business.").

testifying that she cited someone for standing two feet in front of a Lincoln Road cosmetics store and "waving to the customers to come inside."). The ordinance upheld in *Sciarrino*, as the Eleventh Circuit understood it, is much less intrusive than the one adopted by the City of Miami Beach.

The Court bears this in mind as it turns to the evidence adduced at the preliminary injunction hearing. Substantial testimony compels the conclusions that (1) less-restrictive alternatives, in the vein of restricting but not banning, are available to the City and are in fact currently used in analogous contexts, and (2) the City failed to show that those less-restrictive alternatives would not adequately protect its interests.

The City offered the testimony of former Assistant City Manager Jose Jimenez, who "represent[ed] the city administration in its consideration of its amendments to its hand billing and solicitation ordinances." TR 07/27, at 68:18–21. He testified that "things like charitable solicitations" are "allowed but regulated" in the same areas covered by the challenged ordinances. TR 07/27, at 76:15–17. Those activities are regulated with a "permit[,] especially if you're going to set up a table." *Id.* at 76:18–20. Jimenez elaborated on other activities that are allowed but regulated in the City's historic district: "When we have artists or vendors, they're also done by a lottery, and they are spaced appropriately. The volume is regulated. The footprint of the display of the art or the jewelry that they're selling or any music that they might have, that's also heavily regulated." *Id.* at 76:21–25.

These are clear examples of less-restrictive alternatives to a total ban. The City made no attempt to demonstrate why such measures, which it currently applies to "things like charitable solicitations" and "artists or vendors," would not adequately protect its interests if applied to the type of solicitation prohibited by the challenged ordinance. Presumably, a charitable solicitor, who asks pedestrians if they would like to save Lolita the whale, is no less annoying than one of Plaintiffs' greeters, who asks pedestrians if they would like a free demonstration. Presumably, a charitable solicitor (who is evidently permitted to set up a table), an artist, or a vendor, causes no more congestion or aesthetic blight than one of Plaintiffs' greeters. *Cf. Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 72–73 (1981) (rejecting Mt. Ephraim's argument that it may selectively ban live entertainment from the broad range of commercial uses for reasons normally associated with zoning in commercial

15

districts such as parking, noting that "[w]e do not find it self-evident that a theater, for example, would create greater parking problems than would a restaurant.").

Jimenez offered only brief speculation about the inadequacy of certain less-restrictive alternatives—which the City admittedly did not try. In crafting the challenged ordinance, the City "bounced around several ideas." TR 07/27, at 100:21. One of them was establishing "solicitation boxes," out of which the solicitors could not go while soliciting. *See id.* at 100:17–102:24.[14]

Jimenez offered only weak explanations as to why "solicitation boxes" would not work, including that "we couldn't guarantee people would stay in them." *Id.* at 101:18–19. The court is not convinced. For neither can the City guarantee that solicitors will stay in their stores in the face of the current total ban; and neither can the City guarantee that charitable solicitors will not breach the terms of their permits; and neither can the City guarantee that artists and vendors will not exceed the volume and spacing restrictions imposed on them. Professing an inability to guarantee total compliance with a less-restrictive alternative to a total ban (such as volume or spacing limitations) does not demonstrate the alternative's inadequacy to vindicate the City's interests.

The Court notes that Plaintiffs made an effort to self-regulate in the fashion of "solicitation boxes," by laying down tape in the shape of a box in front of their stores, beyond which their employees were not to pass when soliciting. *See* TR 04/29, at 44:1–23. However, the record testimony is undeveloped as to whether this specific form of self-regulating adequately advanced the City's interests. In response to a question about "a period of three months . . . where the City wasn't enforcing its commercial solicitation ordinances against the plaintiffs," Jimenez testified that the City "had just as many, if not more, complaints during that period." TR 07/27, at 104:6–14. This three-month period refers to an arrangement between Plaintiffs and the City that some witnesses called the "status quo" agreement. Although it is not entirely clear,[15] the Court infers from the record that Plaintiffs

---

[14] Others were establishing fictitious "bubbles" surrounding each pedestrian into which solicitors could not intrude, or limiting the ban to aggressive solicitations.

[15] Guy Weissman's testimony suggests that his decision to "put down a box" may have pre-dated the "status quo" agreement. *See* TR 07/27, at 161:13–21.

16

operated using their self-imposed boxes during this three-month period, (TR 07/27, at 163:22–23),[16] and that the City still received nine complaints about three of the plaintiffs. TR 07/27, at 132:5–17. But the incomplete testimony about this "status quo," involving some effort by the Plaintiffs (but not other store owners or restaurateurs) at self-regulation, where the City was not even enforcing its ordinances, cannot tell the Court anything meaningful about whether that specific form of a less-restrictive alternative can adequately advance the City's interests.

What was said of Florida in *Fane v. Edenfield* may be said of the City here: It "has the duty to at least explore less intrusive alternatives than a blanket ban" on solicitation. 945 F.2d at 1519. The City failed to do so. *Cf. In re R.M.J.*, 455 U.S. 191, 206 (1982) ("There is no indication in the record of a failed effort to proceed along such a less restrictive path."); *Zauderer*, 471 U.S. at 648 ("nowhere does the State cite any evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertising cannot be combated by any means short of a blanket ban."). Under this ordinance, the defined form of solicitation is prohibited outright. A store owner that stands two feet in front of his own store (or in his doorway, or in his window) and waves to someone outside may reasonably fear a citation. *See* TR 07/28, at 16:11–17:19. Such a total proscription, which substantially ropes in such passive, non-obstructive behavior, cannot be narrowly tailored.

Or if it somehow is, the City has failed to justify it.[17] The City's own practice of "allow[ing] but regulat[ing]" similar activities; the precedent of *Sciarrino*, which upheld an ordinance that made soliciting "significantly restricted, but not banned[;]" and the City's failure to demonstrate why such less-restrictive alternatives would not adequately vindicate its interests, convince this Court that the City's anti-solicitation ordinance is neither "carefully calculated" nor narrowly tailored.

---

[16] This is not to say that their employees always stayed inside those boxes.

[17] For a final example of this failure, Jimenez suggested that "regular quiet solicitation . . . . was becoming a problem because of how many there were." TR 07/27, at 102:21–24. It appears "obvious" and less-restrictive to the Court that such a problem of volume could be ameliorated with a regulation of volume—as the City does with other solicitors, artists, and vendors—rather than with a more-restrictive total ban. *See Discovery Network*, 507 U.S. at 417 n.13.

**3.   The Ordinance's Cost to Plaintiffs' First Amendment Interests is too High**

The Supreme Court has explained that Plaintiffs' commercial speech, though entitled to less protection than other forms of speech, still has "considerable value":

> Unlike many other forms of commercial expression, solicitation allows direct and spontaneous communication between buyer and seller. A seller has a strong financial incentive to educate the market and stimulate demand for his product or service, so solicitation produces more personal interchange between buyer and seller than would occur if only buyers were permitted to initiate contact. Personal interchange enables a potential buyer to meet and evaluate the person offering the product or service and allows both parties to discuss and negotiate the desired form for the transaction or professional relation. Solicitation also enables the seller to direct his proposals toward those consumers who he has a reason to believe would be most interested in what he has to sell. For the buyer, it provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market.
> . . . .
> The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment.

*Edenfield*, 507 U.S. at 766–67.

Moti Shenfarber, a representative of three of the Plaintiffs, testified that his clientele are the shoppers of Lincoln Road: those pedestrians—mostly tourists—who walk by his stores. TR 04/29, at 38:2–3, 14–15. He testified that he has tried other forms of advertising: he has tried an e-mail campaign, tried to promote on Google and in magazines, worked on a referral program with beauty salons, and talked with bellboys and concierges (presumably to get them to refer patrons to his stores). This was all to no discernable benefit. *Id.* at 38:4–39:12. Guy Weissman, the general manager of Brilliance New York, testified that face-to-face soliciting is the only way to effectively sell his products to his customers—although he testified that the only thing he tried differently (with no success) was e-mailing customers who patronized his store. TR 07/27, at 171:10–172:3.

18

Plaintiffs' testimony illustrates the "considerable value" of commercial speech, as recognized by the Supreme Court—particularly the value of in-person communication, particularly for them. Sales procured through such solicitations are the lifeblood of their businesses. Plaintiffs demonstrate how the City's blanket ban on solicitations exacts a high cost on their First Amendment interests—for it prohibits them entirely from soliciting where they need it most, and even farther, into the doorposts and windows of their stores. This is why the limited geographical reach of the ordinance incurs it no favor. The oft-repeated principle applies forcefully to Plaintiffs here, that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey, Irvington*, 308 U.S. 147, 163 (1939).

The cost is too high. The ordinance is a disfavored blanket ban, and the City has failed to demonstrate the inadequacy of less-restrictive alternatives. The City failed to demonstrate narrow tailoring on multiple fronts which, combined, convince this Court that Plaintiffs have shown a substantial likelihood of success on the merits of their claim that, as applied to their speech, the City's anti-solicitation ordinance violates the First Amendment.

## IV.   The Anti-Handbilling Ordinance

Although "the lawfulness of the particular application of the law should ordinarily be decided first," *Fox*, 492 U.S. at 485, the Court finds it appropriate to proceed directly to Plaintiffs' overbreadth challenge to the anti-handbilling ordinance.[18] That is because, unlike the anti-solicitation ordinance, the overbreadth of the anti-handbilling ordinance is glaring on its face. The prudential concerns that might otherwise dissuade this Court from proceeding directly to an overbreadth challenge—such as the difficulty in determining whether an ordinance's overreach is substantial, the proper functioning of courts, and their efficiency—lose their force in the face of the ordinance's staggering prohibition.

The anti-commercial-handbilling ordinance (Section 46-92) reads, in pertinent part, as follows:

---

[18] *See Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993) ("Where the statute governs both commercial and noncommercial speech, however, a litigant with a commercial speech interest may nonetheless qualify by virtue of the overbreadth rule to assert the speech rights of third parties with noncommercial speech interests.").

[(a)] (3) *Handbill* means any handbill, flyer, paper, document, dodger, circular, folder, booklet, letter, card, pamphlet, sheet, poster, sticker, banner, notice or other written, printed or painted matter or object that conveys any information, except that "handbill" shall not include a newspaper or its contents.

(4) *Commercial handbill* means any handbill that conveys any information about any good or service provided by a business.
. . . .
(8) *Right of way* means and includes, but is not limited to, any state, county, or city-owned public street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway.
. . . .
(g) *Prohibitions on commercial handbill distribution.*

(1) *Historic Areas.* It shall be unlawful for any person to distribute commercial handbills on the right-of-way in [certain streets and other areas of the City's entertainment district. *See* Appendix 1. The full text of this ordinance and its amendments are attached to this opinion as Appendix 3.]
. . . .
     The prohibitions in this subsection (g) shall apply to the distribution of commercial handbills on any right-of-way, including but not limited to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way. All rights-of-way identified as prohibited areas shall include the entire width of the right-of-way, including all sidewalks.

(2) *Sidewalk cafes.* Commercial handbills shall not be distributed on the right-of-way:

a.     Within 20 feet in any direction from the outside perimeter of any approved sidewalk cafe (as indicated in the approved site plan attached to the city-issued permit); and

b.     On any right-of-way within the approved sidewalk cafe.

(3) *Beaches.* Commercial handbills shall not be distributed on any city beach east of the dunes.

     On its face, the anti-handbilling ordinance prohibits far more than commercial speech. Although the ordinance employs the phrase "commercial handbills," it defines that phrase as "any handbill that conveys any information about any good or service provided by a business." The breadth of the prohibition is staggering. It prohibits expression by handbills to the furthest imaginable extent, where the subject of the expression is "any good or service

20

provided by a business." Even the broadest take on "commercial speech" leaves no doubt that such speech can comprise only a small share of what this ordinance prohibits.

In *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, the Supreme Court confronted a resolution "banning 'all First Amendment activities' at Los Angeles International Airport." 482 U.S. 569, 570 (1987). Inferring from the plain language of the resolution, the Supreme Court concluded that "it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing." *Id.* at 575. Under the anti-handbilling ordinance, there is similarly no shortage of readily inferred examples. No stretch of the imagination is necessary, and no liberality of construction is required, to see an expansive universe of non-commercial speech prohibited by the ordinance:

- An animal-rights activist stands near McDonalds on Washington Avenue, handing out flyers that read, "Shame on McDonalds! They Don't Use Cage-Free Eggs!"
- Her friend walks around Lummus Park, distributing bumper stickers that read, "Free Lolita! The Seaquarium keeps her in a small tank!"
- A rabbi stands on Ocean Drive, and distributes pamphlets to visiting yeshiva students that inform them which restaurants in the area serve kosher food.
- A food critic, who wants more people to visit her website and to read her blog, distributes laminated placards that list the names, locations, and her review of "Foodie Freddi's Four Favorite Pizza Shops on Lincoln Road."
- Someone stations herself near a cigar store on Española Way, handing out stickers that read, "Smoking tobacco is bad for your health."

Of course, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800. Furthermore, the Court is "reluctant . . . to invalidate legislation 'on the basis of its hypothetical application to situations not before the Court.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 584 (1998) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 743 (1978)). "However, where the [ordinance] unquestionably attaches sanctions to protected conduct, the likelihood that the [ordinance] will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack." *Id.* at 800 n.19. In this case, it simply cannot be said that the "arguably impermissible applications of the [ordinance] amount to [no] more than a tiny fraction of the materials within the [ordinance's] reach." *See N.Y. v. Ferber*, 458 U.S. 747, 773 (1982). While it is not so broad as an ordinance "banning all 'First

Amendment activities,'" it nevertheless "reaches the universe of expressive activity" concerning goods or services provided by businesses. *See Bd. of Airport Comm'rs*, 482 U.S. at 570, 574. The qualification that it does so only where that expressive activity takes the form of handbilling is no mitigation. "One who is rightfully on a street open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word.'" *Taxpayers for Vincent*, 466 U.S. at 809–10 (quoting *Jamison v. Texas*, 318 U.S. 413, 416 (1943)).

The Court finds no apparent saving construction of the ordinance—neither an authoritative narrowing construction given by Florida courts, *see Gooding v. Wilson*, 405 U.S. 518, 520 (1972), nor a narrowing construction permitted by the plain language of the ordinance. *See Houston v. Hill*, 482 U.S. 451, 468 (1987) ("This ordinance is not susceptible to a limiting construction because . . . its language is plain and its meaning unambiguous."). Neither have the parties directed this Court to any source that would permit a saving construction. Given the ordinance's sweep, "it is difficult to imagine that" it "could be limited by anything less than a series of adjudications, and the chilling effect of the [ordinance] on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Bd. of Airport Comm'rs*, 482 U.S. at 575–76.

The First Amendment forbids the City from silencing its citizenry on the subject of "any good or service provided by a business" where their chosen form of expression is the distribution of a "handbill"—which under the ordinance means any conceivable form of paper (and more) except newspaper (which the ordinance does not define[19]). The fact that the

---

[19] Although the Court does not rule on vagueness grounds, it notes that the ordinance does have vagueness problems. *Cf. Bd. of Airport Comm'rs*, 482 U.S. at 576 (although not expressly ruling on vagueness grounds, noting that "the vagueness of [a] suggested [limiting] construction itself presents serious constitutional difficulty."). For example, Jimenez testified that the *Miami New Times* published an article favoring the City's position in this litigation. *See* DE 35-13. Is the *Miami New Times* a "newspaper"? Under the ordinance, it is anyone's (including any enforcement officer's) guess. If it were a close question, as between the *Miami New Times* and a similar publication that published an article lambasting the City's position in this litigation, might a City enforcement officer determine that one is a "newspaper" and the other is not? "Such an ordinance that confers on enforcement officers '"a virtually unrestrained power"' to charge persons with a violation may be unconstitutional "because '[t]he opportunity for abuse . . . is

ordinance extends to a limited geographical area does not save it from its overreaching within that area—the quintessential public forum.[20]

The overbreadth of the anti-handbilling ordinance, which prohibits handbilling on the basis of a handbill's content,[21] is substantial. Plaintiffs have shown a substantial likelihood of success on the merits of their claim that the ordinance is unconstitutional on its face.

## V.   **Plaintiffs Have Shown Irreparable Injury**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (affirming the conclusion that the district court abused its discretion in denying preliminary injunctive relief, where the loss of First Amendment freedoms "was both threatened and occurring at the time of respondents' motion [for preliminary injunction] and since respondents sufficiently demonstrated a probability of success on the merits"). As the Eleventh Circuit has held,

> [t]he only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence. The rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by money damages; in other words, plaintiffs could not be made whole.

*KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (alteration in original). Plaintiffs here have demonstrated that the ordinances chill their First Amendment interests, which shows an irreparable injury.

---

self-evident.'" *Id.* at 576 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135–36 (1974) (Powell, J., concurring)).

[20] The prohibition on handbilling also extends into private property interests, just like the anti-solicitation ordinance.

[21] *Cf. Reed v. Gilbert*, 135 S.Ct. 2218, (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional").

Before turning to the third and fourth prongs of the preliminary injunction standard, the Court observes that its holding with respect to the anti-solicitation ordinance is an as-applied holding. Of course, as-applied does not necessarily, as a practical matter, mean as-applied; for the Supreme Court has recognized that an as-applied holding's rationale "may be so broad as to render the [ordinance] effectively unenforceable." *Fox*, 492 U.S. at 485. But this Court cannot resolve that post-hoc interpretive problem, or account for what the City's enforcement calculations might be after the ink has dried. In reaching this decision concerning the anti-solicitation ordinance, the Court focuses on the case before it, and tailors its decision to address the ordinance as applied to Plaintiffs' speech.

## VI.   The Threatened Injury to Plaintiffs Outweigh Whatever Damage the Proposed Injunction May Cause the City

Elsewhere in this opinion, the Court has accepted both the importance of Plaintiffs' First Amendment interests and the legitimacy and substantiality of the City's asserted interests in the ordinances. However, Plaintiffs have demonstrated that the threatened injury they face outweighs whatever damage the proposed injunction may cause the City. For all of the City's alarm at the rising tide of solicitation and handbilling activities in its historic district, time and again during the preliminary injunction hearing its officials (and other witnesses) acknowledged that visitation, property values, and other metrics of economic well-being in the historic district have only improved in tandem with those activities. *See* TR 07/27, at 139:17–140:7 (visitors, sales revenue, cost of rent, and taxes are all up in Miami Beach at the same time as the soliciting and handbilling problems); *id.* at 71:12 ("we're riding a good wave now"); *id.* at 71:17–23 (describing a more-than-ten-fold rise in rent per square foot since the 1990s and remarking, "Now we are at a boom"); *id.* at 96:17–21 (testifying that the City "outgrew" its old handbilling regulation because the City went from "identifiable high impact weekend[s] and then some relatively calm ones to mostly high impact weekends and then ones that were even busier than that.").

While the City did show that it has directed personnel and financial resources away from other City districts to the historic district to deal with the solicitation problem, it offered

very little elaboration. *See* TR 07/28, at 38:20–39:3. On this record, the Court cannot consider it to be a significant harm.

The City has at most been able to show harm to its aesthetic interests in keeping its walking public free from annoyance. The Court does not discount this interest, but damage to the Plaintiffs' interest in "that great Amendment"[22] outweighs damage to the City's asserted interest in aesthetics.[23]

## VII.   If Issued, the Injunction Will not Be Adverse to the Public Interest

Finally, the Court concludes that the proposed injunction will not be adverse to the public interest. Rather, in the Court's view, to preliminarily enjoin the challenged ordinances is to vindicate the public interest in "the freedom of speech." U.S. Const. amend. I.[24]

## VIII.   Conclusion

Therefore, it is **ORDERED, ADJUDGED, and DECREED**:

1.      Plaintiffs' Renewed Motion for Preliminary Injunction **(DE 27)** be, and the same is, hereby **GRANTED**.

2.      The City of Miami Beach is preliminarily **ENJOINED** from enforcing Section 74-1 of its Code of Ordinances against Plaintiffs.

3.      The City of Miami Beach is preliminarily **ENJOINED** from enforcing Section 46-92 of its Code of Ordinances.

---

[22] *Schad*, 452 U.S. at 88 (Burger, C.J., dissenting).

[23] The Court declines to set a bond. The City has not demanded one and, as detailed in this Part, the City has not shown that it will suffer any appreciable monetary harm should the Court enjoin enforcement of the ordinances. *See AFC Enters., Inc. v. THG Restaurant Grp., LLC*, 416 F. App'x 898, 898 (11th Cir. 2011) ("it is within the discretion of the court to set the amount of the bond or to require 'no security at all.'") (quoting *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005)).

[24] Because the Court rules on First-Amendment grounds, there is no need to address Plaintiffs' equal protection argument at this time.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 31st day of August, 2015.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:    All Counsel of Record